UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
EX REL. [UNDER SEAL] )
                                              )
                        Plaintiffs, )
          v.                                 )
                                              )
[UNDER SEAL]                          )
                        Defendant )
                                              )

C. A. NO. 03 - 10641 NG

COMPLAINT

# FILED IN CAMERA AND UNDER SEAL





Erika A. Kelton
PHILLIPS & COHEN LLP
2000 Massachusetts Ave NW
Washington, D.C. 20036
Tel: (202) 833-4567
Fax: (202) 833-1815

Howard M. Brown
BARTLETT HACKETT FEINBERG P.C.
10 High St., Suite 920
Boston, MA 02110
Tel: (617) 422-0200
Fax: (617) 896-6263
Attorneys for <u>Qui</u> <u>Tam</u> Plaintiff

MAGISTRATE JUDGE _Dein_

RECEIPT # _46291_
AMOUNT $ _150_
SUMMONS ISSUED _yes_
LOCAL RULE 4 1_____
WAIVER FORM_____
MCF ISSUED_____
BY DPTY CLK_ _T.O.M_
DATE _4-8-03_

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

**03 - 10641 NG**

|  |  |
|---|---|
| UNITED STATES OF AMERICA ) | |
| EX REL. THOMAS GERAHTY ) | C.A. No. _____ |
| ) | |
| Plaintiffs, ) | COMPLAINT FOR VIOLATION |
| v. ) | OF FEDERAL FALSE CLAIMS ACT |
| ) | [31 U.S.C. §3729 <u>et</u> <u>seq</u>.] |
| GLAXOSMITHKLINE PLC and ) | |
| SMITHKLINE BEECHAM CORP. d/b/a ) | FILED IN CAMERA |
| GLAXOSMITHKLINE ) | AND UNDER SEAL |
| Defendants ) | |
| ) | JURY TRIAL DEMANDED |

Plaintiff Thomas Gerahty, through his attorneys Phillips & Cohen LLP and Bartlett

Hackett Feinberg P.C., for his Complaint against defendants GlaxoSmithKline PLC and

SmithKline Beecham Corp. d/b/a GlaxoSmithKline alleges based upon personal knowledge

and relevant documents, as follows.

1

## I.    **INTRODUCTION**

1.    This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent records, statements and claims made, used and caused to be made, used or presented by defendants GlaxoSmithKline plc and SmithKline Beecham Corp. d/b/a GlaxoSmithKline (collectively "Glaxo") and/or their agents, employees and co-conspirators in violation of the Federal Civil False Claims Act, 31 U.S.C. §3729 et seq., as amended ("the FCA" or "the Act").

2.    For at least the past four and a half years, Glaxo has illegally promoted an antidepressant medication - Wellbutrin SR - for off-label indications. Since at least 1999, Glaxo has mounted a national campaign to promote Wellbutrin SR for numerous medical disorders outside of its single, FDA-approved indication - i.e., depression. As alleged below, Glaxo's "off label" marketing of Wellbutrin SR promoted its use in a broad range of treatments from weight loss to chronic fatigue syndrome. Glaxo's improper marketing of Wellbutrin SR has been immensely profitable. In a mere four and a half years Wellbutrin SR was transformed into one of Glaxo's crown jewels, with sales revenues that more than quadrupled

3.    Glaxo's success, however, was the result of marketing and promotional activities that are prohibited by federal law. As a direct result of Glaxo's improper practices federal health insurance programs including, but not limited to, Medicaid, CHAMPUS/TRICARE, CHAMPVA and the Federal Employee Health Benefits Program have been caused to pay false or fraudulent claims for reimbursement of off-label uses of Wellbutrin SR that would not have been paid but for the defendants' illegal business

2

practices.

4.       The False Claims Act was originally enacted during the Civil War, and was substantially amended in 1986.  Congress amended the Act to enhance the Government's ability to recover losses sustained as a result of fraud against the United States after finding that fraud in federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating government fraud, was in need of modernization. Congress intended that the amendments create incentives for individuals with knowledge of fraud against the government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

5.       The Act provides that any person who knowingly submits, or causes the submission of, a false or fraudulent claim to the U.S. Government for payment or approval is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the Government.  Liability attaches when a defendant knowingly seeks payment, or causes others to seeks payment, from the Government that is unwarranted.

6.       The Act allows any person having information about a false or fraudulent claim against the Government to bring an action for himself and the Government, and to share in any recovery.  The Act requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the Government time to conduct its own investigation and to determine whether to join the suit.

7.       Based on these provisions, qui tam plaintiff and relator Thomas Gerahty seeks through this action to recover damages and civil penalties arising from Glaxo's making or

3

causing to be made false or fraudulent records, statements and/or claims in connection with

its knowing off-label marketing of Wellbutrin SR. Although Glaxo did not directly submit

claims for Wellbutrin SR to federal health insurance programs, it knew that its illegal off-

label marketing practices would cause the submission of thousands of claims to federal health

insurance programs for prescriptions of Wellbutrin SR that were not eligible for program

reimbursement.

## II.   PARTIES

8.      Plaintiff/relator Thomas Gerahty is a resident of Pittsboro, North Carolina.

Since May 2002, Mr. Gerahty has been employed by Glaxo as a Senior Marketing

Development Manager for Pennsylvania, western New York and southern New Jersey.

9.      Defendant GlaxoSmithKline plc ("GSK") is a public limited company,

incorporated under English law, with headquarters in Brentford, England. It has operational

headquarters in Research Triangle Park, North Carolina and in Philadelphia, Pennsylvania.

GSK is one of the world's leading pharmaceutical companies, with approximately seven

percent of the pharmaceutical market. GSK employs approximately 100,000 people

worldwide. About 44,000 have roles in sales and marketing, which represents one of the

largest (if not the largest) sales force in the pharmaceutical industry. In 2002, GSK's sales

were approximately $31.8 billion. Its before-tax profits for 2002 were approximately $9.7

billion.

10.     Defendant SmithKline Beecham Corp. d/b/a GlaxoSmithKline

("GlaxoSmithKline) is a Pennsylvania corporation with headquarters in Philadelphia. It is

the United States subsidiary of GSK.

4

11.     Until 2000, Glaxo was two separate corporate entities - Glaxo Wellcome plc

("GW") and SmithKline Beecham plc ("SKB").   GW and SKB each had United States

subsidiaries, Glaxo Wellcome Inc ("GW Inc.) and SmithKline Beecham Corp. (SKB Corp."),

respectively.   In 2000, GW and SKB merged to create the new corporate entity

GlaxoSmithKline plc.   In addition, GW Inc. and SKB Corp. also merged, with SKB Corp. as

the surviving entity.   In 2001, SKB Corp. filed to do business under the "fictitious name"

GlaxoSmithKline.   As a result of the merger transactions, GlaxoSmithKline plc and

GlaxoSmithKline are responsible for liabilities resulting from the acts or omissions of GW,

SKB and GW Inc. that occurred prior to the 2000 merger transaction.

## III.     JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action pursuant to

both 28 U.S.C. §1331 and 31 U.S.C. §3732, the latter of which specifically confers

jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730.   Under

31 U.S.C. §3730(e), there has been no statutorily relevant public disclosure of the

"allegations or transactions" in this Complaint.

13.     This Court has personal jurisdiction over the defendants pursuant to 31 U.S.C.

§3732(a) because that section authorizes nationwide service of process and because the

defendants have minimum contacts with the United States.   Moreover, the defendants can be

found in, reside, or transact or have transacted business in the District of Massachusetts.

14.     Venue is proper in this District pursuant to 31 U.S.C. §3732(a) because the

defendants can be found in and transact or have transacted business in the District of

Massachusetts.   At all times relevant to this Complaint, defendants regularly conducted

5

substantial business within the District of Massachusetts, maintained employees and offices in Massachusetts and made significant sales within Massachusetts.  In addition, statutory violations, as alleged herein, occurred in this district.

## IV.    BACKGROUND

15.    Glaxo is one of the largest - and most profitable - pharmaceutical companies in the world.  It manufactures a wide range of prescription products including, inter alia, drugs for the treatment of central nervous system, respiratory, cardiovascular, and gastro-intestinal disorders, as well as cancer treatments.

16.    One of Glaxo's leading prescription drug products is an antidepressant named Wellbutrin SR (sustained release) which was introduced in the mid-1990s.  It was preceded to market and FDA approval by Wellbutrin IR (immediate release), which was introduced in the mid-1980s.

17.    Wellbutrin SR has only one on-label indication - i.e., the treatment of depression in patients 18 years of age and older.  A diagnosis of depression is defined as (1) depressed mood or (2) loss of interest or pleasure, and at least five of the following symptoms are present during a two week period and represent a change in previous behavior - depressed mood, markedly diminished interest or pleasure in usual activities, significant change in weight and/or appetite, insomnia or hypersomnia, psychomotor agitation or retardation, increased fatigue, feelings of guilt or worthlessness, slowed thinking or impaired concentration, and a suicide attempt or suicide ideation.

18.    Wellbutrin SR is contraindicated in patients with, inter alia: a seizure disorder; a current or prior diagnosis of bulimia or anorexia; in patients undertaking an abrupt

6

discontinuation of alcohol or sedatives. Indeed, Wellbutrin IR (which contains the same active agent as Wellbutrin SR) was withdrawn from the market for approximately three years because of seizure concerns.

19.     Wellbutrin SR is unique among antidepressants. Its active pharmacological agent - bupropion - is classified as a dopamine reuptake blocking compound, and works by increasing levels of the chemical neurotransmitters dopamine and norepinephrine.

20.     Wellbutrin SR's primary competitors include Paxil, Prozac, Zoloft, Effexor and Celexa, among others. These antidepressants are categorized as selective serotonin reuptake inhibitors ("SSRIs").

21.     SSRIs are, by far, the most popular antidepressants and represent the vast majority of the antidepressant market share. Because Wellbutrin SR and the SSRIs have the same single on-label indication - depression - they are direct competitors. Wellbutrin SR and the SSRIs, however, have different side effect profiles. In its on-label use in treating depression, Wellbutrin SR has been found to have less impact on weight gain and sexual function than the SSRIs.

22.     Glaxo may properly distinguish Wellbutrin SR and the SSRIs on the basis of their respective side effect profiles in the treatment of depression. It is, however, illegal for Glaxo to promote Wellbutrin SR for treatment of SSRI-induced side effects, for the treatment of co-morbidities, or for the treatment of any condition other than the drug's single, FDA-approved on-label depression indication.

23.     A co-morbidity is a disorder that may appear with other separate disorders. It is a separate and distinct indication and is properly treated as such. Although a disorder may

7

tend to appear with another disorder, a drug may not be promoted to treat a co-morbid disorder unless it is specifically FDA-approved for that indication. Thus, an antidepressant may not be promoted as a treatment for a "co-morbid" disorder that may sometimes afflict a depressed individual, unless the drug is specifically approved by the FDA for that indication.

24.     Likewise, an antidepressant may not be promoted to treat the side effects of other anti-depressants (as opposed to the underlying depression) unless specifically approved by the FDA for the treatment of those side effect indications.

25.     As alleged below, Glaxo systematically, aggressively and improperly promoted Wellbutrin SR for numerous off-label and unapproved uses.

26.     In the United States, Wellbutrin SR sales and marketing efforts are undertaken by Glaxo's Central Nervous System ("CNS") Division. During the period at issue, Stan Hull has been the Senior Vice President of Glaxo's CNS Division, and thus has supervised all Wellbutrin SR marketing and sales activities.

27.     Wellbutrin SR sales and marketing are undertaken through 14 regions, each of which is organized into numerous sales districts. Approximately 1,200 sales representatives are engaged in promoting Wellbutrin SR. Each Glaxo sales representative reports to a District Sales Manager, who in turn reports to a Regional Vice President. Each region also has an assigned Marketing Development Manager who serves as a liaison between Glaxo's sales and marketing arms, and between Glaxo headquarters and the field.

28.     Glaxo sales representatives receive incentive-based compensation that includes an annual salary, plus a quarterly bonus. An individual sales representative's bonus is determined by his/her performance in the relevant market and whether s/he satisfies or

8

surpasses targets for quarterly market share change.  Accordingly, the more Wellbutrin SR

sold by a Glaxo sales representative the higher his or her compensation will be.  In addition,

Glaxo's sales organizations offer additional incentives such as Hawaiian vacations for

winners of periodic sales challenges.

## V.     APPLICABLE LAW

### A.      The FDA Regulatory Scheme

29.     Under the Food, Drug, and Cosmetics Act ("FDCA"), 21 U.S.C. §§ 301-97,

new pharmaceutical drugs cannot be marketed in the United States unless the sponsor of the

drug demonstrates to the satisfaction of the Food and Drug Administration ("FDA") that the

drug is safe and effective for each of its intended uses.  21 U.S.C. §355(a) & (d).  Approval

of the drug by the FDA is the final stage of a multi-year process of study and testing.

30.     The FDA does not approve a drug for treatment of sickness in general.

Instead, a drug is approved for treatment of a specific condition, for which the drug has been

tested in patients.  The specific approved use is called the "indication" for which the drug

may be prescribed.  The FDA will specify particular dosages determined to be safe and

effective for each indication.

31.     The indication and dosages approved by the FDA are set forth in the drug's

labeling, the content of which is also reviewed by the FDA.  21 U.S.C. §§352, 355(d).  An

example of the drug's labeling is the printed insert in the drug's packaging.  The FDA will

only approve the new drug application if the labeling conforms to the uses and dosages that

the FDA has approved.  21 U.S.C. §355(d).

32.     Under the Food and Drug Administration Modernization Act of 1997

9

("FDAMA"), if a manufacturer wishes to market or promote an approved drug for alternative uses - i.e., uses not listed on the approved label - the manufacturer must resubmit the drug for another series of clinical trials similar to those for the initial approval. 21 U.S.C. §360aaa(b) & (c). Until subsequent approval of the new use has been granted, the unapproved use is considered to be "off-label." "Off-label" refers to the use of an approved drug for any purpose, or in any manner, other than what is described in the drug's labeling. Off-label use includes treating a condition not indicated on the label, treating the indicated condition at a different dose or frequency than specified in the label, or treating a different patient population (e.g., treating a child when the drug is approved to treat adults).

33.     Although the FDA is responsible for ensuring that a drug is safe and effective for the specific approved indication, the FDA does not regulate the practice of medicine. Once a drug is approved for a particular use, the FDA does not prohibit doctors from prescribing the drug for uses that are different than those approved by the FDA.

34.     Although physicians may prescribe drugs for off-label usage, the law prohibits drug manufacturers from marketing or promoting a drug for a use that the FDA has not approved. Specifically, under the Food and Drug laws, (1) a manufacturer may not introduce a drug into interstate commerce with an intent that it be used for an off-label purpose, and (2) a manufacturer illegally "misbrands" a drug if the drug's labeling (which includes all marketing and promotional materials relating to the drug) describes intended uses for the drug that have not been approved by the FDA. 21 U.S.C. §§331, 352.

35.     An off-label use of a drug can cease to be off label only if the manufacturer submits a supplemental application and demonstrates to the satisfaction of the FDA that the

10

product is safe and effective for the proposed new use. 21 U.S.C. §360aaa(b) & (c).

36.     In addition to prohibiting manufacturers from directly marketing and promoting a product's off-label uses, Congress and the FDA have also sought to prevent manufacturers from employing indirect methods to accomplish the same end. For example, Congress and the FDA have attempted to regulate two of the most prevalent indirect promotional strategies:  (1) manufacturer dissemination of medical and scientific publications concerning the off-label uses of their products, and (2) manufacturer support for Continuing Medical Education (CME) programs that focus on off-label uses.

37.     With regard to the first practice - disseminating written information - the FDAMA only permits a manufacturer to disseminate information regarding off-label usage in response to an "unsolicited request from a health care practitioner." 21 U.S.C. §360aaa-6 (emphasis added). In any other circumstance, a manufacturer is permitted to disseminate information concerning the off-label uses of a drug only after the manufacturer has submitted an application to the FDA seeking approval of the drug for the off-label use; has provided the materials to the FDA prior to dissemination; and the materials themselves must be in an unabridged form and must not be false or misleading. 21 U.S.C. §§ 360aaa(b) & (c); 360aaa-1.

38.     With regard to manufacturer involvement in CME programs, the FDA's examination of these practices led to publication of an agency enforcement policy in 1997 entitled, "Guidance for Industry:  Industry-Supported Scientific and Educational Activities," 62 Fed. Reg. 64,074, 64,093, 1997 WL 740420 (F.R.) (1997). This guidance document states that CME programs must be truly independent of the drug companies, and sets forth a

11

number of factors that the FDA will consider in determining whether a program is "free from the supporting company's influence and bias." Id. These factors include, among others, an examination of the relationship between the program provider and supporting company, the company's control of content and selection of presenters, whether there is a meaningful disclosure of the company's funding and role in the program, whether multiple presentations of the same program are held, whether the audience is selected by the sales and marketing department of the company, and whether information about the supporting company's product is disseminated after the initial program other than in response to an unsolicited request. Id. The promotion of off-label drug uses at a CME program which fails this test of "independence" violates Congress' off-label marketing restrictions.

39.     In sum, the off-label regulatory scheme protects patients and consumers by insuring that drug companies do not promote drugs for uses other than those found to be safe and effective by an independent, scientific governmental body, the FDA.

**B.     Prescription Drug Reimbursement Under Federal Health Care Programs**

40.     Whether a drug is FDA-approved for a particular use will largely determine whether a prescription for that use will be reimbursed under Medicaid and other federal health care programs.

**1.     The Medicaid Program**

41.     Medicaid is a public assistance program providing for payment of medical expenses for low-income patients. Funding for Medicaid is shared between the federal government and state governments. The Medicaid program subsidizes the purchase of more prescription drugs than any other program in the United States.

12

42.     Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines. Federal statutes and regulations restrict the drugs and drug uses that the federal government will pay for through its funding of state Medicaid programs. Federal reimbursement for prescription drugs under the Medicaid program is limited to "covered outpatient drugs." 42 U.S.C. §1396b(i)(10), 1396r-8(k)(2), (3). Covered outpatient drugs are drugs that are used for "a medically accepted indication." Id. §1396r-8(k)(3).

43.     A medically accepted indication, in turn, is a use which is listed in the labeling approved by the FDA, or which is included in one of the drug compendia identified in the Medicaid statute. Id. §1396r-8(k)(6). During the time period relevant to this Complaint, the off-label uses of Wellbutrin SR promoted by Glaxo were not eligible for reimbursement from Medicaid because the drug's off-label uses were neither listed in the labeling approved by the FDA nor included in any of the drug compendia specified by the Medicaid statute.

### 2.     Other Federal Health Care Programs

44.     In addition to Medicaid, the federal government reimburses a portion of the cost of prescription drugs under several other federal health care programs, including but not limited to CHAMPUS/ TRICARE, CHAMPVA and  the Federal Employees Health Benefit Program.

45.     CHAMPUS/TRICARE, administered by the United States Department of Defense, is a health care program for individuals and dependents affiliated with the armed forces. CHAMPVA, administered by the United States Department of Veterans Affairs, is a health care program for the families of veterans with 100 percent service-connected

13

disability. The Federal Employee Health Benefit Program, administered by the United States

Office of personnel Management, provides health insurance for federal employees, retirees,

and survivors. Coverage of off-label drug use under these programs is similar to coverage

under the Medicaid program. See, e.g.,TRICARE Policy Manual 6010.47-M, Chapter 7,

Section 7.1 (B) (2) (March 15, 2002); CHAMPVA Policy Manual, Chapter 2, Section 22.1,

Art. II (A)(2) (June 6, 2002).

46.     During the time period relevant to this Complaint, the off-label uses of

Wellbutrin SR promoted by Glaxo did not qualify for reimbursement under any of the

various federal health care programs.

### 3.     The Anti-Kickback Statute

47.     The federal health care Anti-Kickback statute, 42 U.S.C. §1320a-7b(b), arose

out of Congressional concern that payoffs to those who can influence health care decisions

will result in goods and services being provided that are medically unnecessary, of poor

quality, or even harmful to a vulnerable patient population. To protect the integrity of federal

health care programs from these difficult to detect harms, Congress enacted a prohibition

against the payment of kickbacks in any form, regardless of whether the particular kickback

actually gives rise to overutilization or poor quality of care.

48.     The Anti-Kickback statute prohibits any person or entity from making or

accepting payment to induce or reward any person for referring, recommending or arranging

for the purchase of any item for which payment may be made under a federally-funded health

care program. 42 U.S.C. §1320a-7b(b). Under this statute, drug companies may not offer or

pay any remuneration, in cash or kind, directly or indirectly, to induce physicians or others to

14

order or recommend drugs that may be paid for by Medicaid, CHAMPUS/TRICARE, CHAMPVA, Federal Employee Health Benefit Program, or other federal health care program.

49.     The law not only prohibits outright bribes and rebate schemes, but also prohibits any payment by a drug company to a physician which has as one of its purposes inducement of the physician to write additional prescriptions for the company's pharmaceutical products.

50.     Concern about improper drug marketing practices like those alleged in this Complaint prompted the Inspector General of the Department of Health and Human Services to issue a Special Fraud Alert in 1994 concerning prescription drug marketing practices that violated the Anti-Kickback law. Special Fraud Alert: Prescription Drug Marketing Schemes, 59 Fed. Reg. 65,376 (Dec. 19, 1994). Among the improper practices cited by the Inspector General are drug companies' payments to physicians where the physician had offered no particular services of benefit to the drug company but the payment appeared to have been based on the volume of business the doctor could generate for the drug company. Id.

51.     Compliance with the Anti-Kickback law is a precondition to participation as a health care provider under the Medicaid, CHAMPUS/TRICARE, CHAMPVA, Federal Employee Health Benefit Program, and other federal health care programs. With regard to Medicaid, for example, each physician and pharmacist that participates in the program must sign a provider agreement with his or her state. Although there are variations in the agreements among the states, the agreement typically requires the prospective Medicaid provider to agree that he or she will comply with all Medicaid requirements, which include

15

the anti-kickback provisions of the law. In Massachusetts and a number of other states, the Medicaid claim form itself contains a certification by the provider that the provider has complied with all aspects of the Medicaid program, including compliance with Federal laws.

52.    In sum, either pursuant to provider agreements, claims forms, or other appropriate manner, pharmacists and physicians who participate in a federal health care program generally must certify that they have complied with the applicable federal rules and regulations, including the Anti-Kickback law.

## VI.    **ALLEGATIONS**

53.    Since its introduction, Wellbutrin SR has suffered from a significant marketing hurdle. Surveys conducted by or on behalf of Glaxo have consistently shown that the drug is not perceived as an effective treatment for depression - Wellbutrin SR's only on-label indication.

54.    Beginning in or about 1999, Glaxo initiated efforts to surmount this obstacle through the systematic and rigorous off-label promotion of Wellbutrin SR. The results were hugely profitable. In 1999, Wellbutrin SR revenues were approximately $590 million, and in 2000 its revenues jumped to nearly $800 million. In 2001, they again increased to approximately $1.1 billion and again in 2002 to approximately $1.6 billion. In 2003, at the time of filing the complaint in this action, Wellbutrin SR revenues are on track to exceed $2.1 billion.

55.    Since implementing its off-label promotion of Wellbutrin SR, Glaxo's sales of the drug have increased between approximately 35 and 45 percent each year.

56.    As alleged below, Glaxo's off-label marketing and promotional campaign

16

combined aggressive speaker and "special issue" board events saturated with off-label messages, with targeted sales calls on prescribing physicians by field representatives to reinforce the off-label messages and translate them into increased drug sales.

57.     As detailed below, Wellbutrin SR's commercial success is the result of Glaxo's impermissible and illegal off-label marketing campaign.  As a direct result of Glaxo's illegal practices, federal government health insurance programs have been induced to reimburse claims for prescriptions that they otherwise would not have.  Glaxo's practices have caused damages to the U.S. Treasury greatly in excess of $100 million.

## A.     Internal Glaxo Marketing Strategy For Wellbutrin SR Was Driven By Lucrative Off- Label Markets

58.     Beginning in mid-1999 and continuing through 2003, Glaxo's national marketing strategy for the Wellbutrin SR brand recognized that its off-label uses could provide potentially large gains in sales and revenues for the drug.  Prior to 1999, the Wellbutrin brand struggled to overcome concerns that the drug elevated risk of seizure.  Over the next four years, however, Glaxo surmounted that hurdle by incorporating strong off-label messages into its promotion of Wellbutrin SR.

59.     As alleged below, Glaxo's off-label promotion of Wellbutrin SR was opportunistic, and targeted especially marketable areas of concern for individual health and quality of life - e.g., enhancing sex life, improving weight and body image, addressing substance addictions and managing attention issues.  In the United States, these areas represent multi-billion dollar markets every year.

60.     In 1999, Glaxo instituted "Operation Hustle" - a national sales campaign.  In meetings with national sales and marketing force in approximately 17 cities around the

17

country, Glaxo introduced a new approach to selling Wellbutrin SR.

61.     Rather than only focusing on Wellbutrin SR's on-label indication - i.e., depression - Glaxo's "Operation Hustle" campaign also addressed other, distinct disorders that are not FDA-approved indications for Wellbutrin SR.  In particular, Glaxo instructed its sales force to promote norepinephrine and dopamine, the neurochemical-agents that Wellbutrin SR acts to increase, as effective in treating certain "co-morbid" disorders. Specifically, Glaxo told its sales representatives that increasing levels of norepinephrine could address attention deficit/hyperactivity disorder ("ADHD"), addiction withdrawal syndrome, anxiety associated with depression, and such anxiety disorders as post-traumatic stress syndrome, panic disorder, social phobia, and generalized anxiety disorder.  Similarly, Glaxo advised its sales force that increasing levels of dopamine could address ADHD, craving, chronic fatigue syndrome, and cognitive dysfunction.  In its promotional efforts, Glaxo particularly emphasized those disorders addressed by increasing dopamine levels.

62.     The message in Glaxo's "Operation Hustle" campaign was clear.  Wellbutrin SR, by acting to increase levels of norepinephrine and dopamine, could be used to treat a substantially broader range of indications than mere depression.  Glaxo, thus, represented that Wellbutrin SR's norepinephrine and dopamine combination was effective for numerous distinct and separate indications - from ADHD and addictions to chronic fatigue syndrome, craving and cognitive disorders.

63.     Notwithstanding these claims, Glaxo did not seek FDA approval for these additional indications, or any indications other than depression.  Glaxo's expansive representations about the efficacy of and treatment options with Wellbutrin SR were based

18

mainly on theoretical and speculative surmise rather than thorough, controlled scientific studies.

64.   Although Glaxo characterized ADHD, addiction withdrawal syndrome, anxiety associated with depression, the anxiety disorders of post-traumatic stress syndrome, panic disorder, social phobia, and generalized anxiety disorder, craving, chronic fatigue syndrome, and cognitive dysfunction as "co-morbid disorders," they are all discrete diagnoses and indications, each of which has FDA-approved drugs for their treatment. As alleged above, Wellbutrin SR is not FDA-approved for any of these indications.

65.   Over the next year of Operation Hustle, Wellbutrin SR's sales grew by 34 percent, to nearly $800 million.

66.   In April of 2000, Glaxo developed another strategic plan for the Wellbutrin SR brand. That plan recognized that the recent sales successes of Wellbutrin SR over the past year were due to the "heavy promotion of new indications" as well as its side effect profile. Glaxo also acknowledged that, while Wellbutrin SR's usage for depression had grown by 20 percent, its use for "other" indications had grown by nearly 60 percent. "Other" indications include all the distinct disorders identified in "Operation Hustle."

67.   In 2000, Glaxo's marketing plan continued to identify sales opportunities in non-depression indications including ADHD, anxiety, lethargy and bi-polar disorders. But in addition, Glaxo advocated the use of Wellbutrin SR in combination with other anti-depressants to treat the SSRI-induced side effects such as weight gain and sexual dysfunction. Internally, Glaxo recognized that "add ons" to SSRIs were a very strong sales opportunity for the brand.

19

68.     By 2000, SSRI prescriptions represented as much as 90 percent of all antidepressant prescriptions. At the same time, marketing surveys consistently showed that Wellbutrin SR was regarded as a less effective treatment for depression than the SSRIs. Promoting Wellbutrin SR as an "add on" to treat SSRI side effects would allow Glaxo to greatly expand its market, without having to overcome the strong perception that Wellbutrin SR was ineffective for its single on-label indication.

69.     As an "add on" treatment to SSRIs, Wellbutrin SR was thus promoted not for the depression indication, but rather to control patients' weight and to enhance their sex life. Weight control and sex life enhancement are not FDA-approved indications for Wellbutrin SR.

70.     At the same time that Glaxo identified "add on" treatment as a strong "strategic option" for Wellbutrin SR, the company also acknowledged internally that there was an "unknown proof of [the] concept" that Wellbutrin SR was an effective and safe treatment for SSRI side effects. Nevertheless, Glaxo's brand strategy advocated increasing the use of Wellbutrin SR as an "add on" therapy for those using SSRIs as a first line antidepressant.

71.     The off-label strategy worked. Less than a year later, Glaxo acknowledged that Wellbutrin SR's "use for treatment of antidepressant induced sexual dysfunction has increased due to product positioning," and that it was a "product of choice for adding . . . patients who experience sexual dysfunction or efficacy poop-out."

72.     In 2001, Glaxo's off-label strategy expanded once again. That year, the results of small clinical studies funded by Glaxo were released. The studies all concluded

20

that Wellbutrin SR was an effective treatment for weight loss in nondepressed patients, and that Wellbutrin SR might be an effective treatment for hypoactive sexual desire disorder ("HSDD") in nondepressed women. Although the Glaxo-funded studies were small and preliminary, Glaxo actively incorporated the early results into its Wellbutrin SR marketing strategy, recognizing that strategic opportunities existed for Wellbutrin SR's use as a weight loss aid, and in treating sexual dysfunction in non-depressed patients.

73.     Glaxo saw potential revenue gains for Wellbutrin SR by utilizing for promotional purposes the early clinical data on weight loss and HSDD in nondepressed populations, and integrated the material into its strategic approach for 2002. Accordingly, Glaxo's internal 2002 strategy plan for Wellbutrin SR indicated that the company would utilize putatively "nonpromotional" materials to market Wellbutrin SR. As Glaxo stated: "Through non-promotional means (medical information letters, publications, etc.) optimize use of strong clinical data for prevalence of antidepressant induced sexual dysfunction, comparison vs key competitors in depressed and non-depressed patients for weight loss and HSDD (hyposexual desire disorder)."

74.     As alleged in the next section, Glaxo's Wellbutrin SR promotional strategy and off-label message was taken directly to the prescribing physicians through aggressive speaker programs, so-called "advisory" boards, and frequent visits to physicians by sales representatives. And, as stated above, Glaxo's strategy for Wellbutrin SR has been enormously successful. Revenues for the drug have grown from about $450 million in 1998 to $1.6 billion in 2002. In 2003, revenues are on pace to exceed $2.1 billion.

**B.     Glaxo Used Speaker Programs And "Special Advisory Boards" To Improperly Promote Off-Label Uses Of Wellbutrin SR Directly To**

21

**Prescribing Physicians**

75.     To implement its overall marketing strategy for Wellbutrin SR, Glaxo developed an aggressive speaker program to take its off-label message directly to physician prescribers of Wellbutrin SR.  To evade federal off-label marketing prohibitions, Glaxo structured these programs so that they would appear to be events where putatively "independent" speakers and/or consultants presented their own materials and views about Wellbutrin SR.

76.     There were two central components to Glaxo's promotional campaign.  First, Glaxo created a national speaker program - Peer Review of Intimacy and Depression ("PRIDE") - to elevate and drive the "off-label" for Wellbutrin SR.  The PRIDE program was also supplemented by local and regional speaker programs, which very frequently used the same PRIDE speakers.

77.     Second, Glaxo utilized hundreds - if not thousands - of "special advisory boards" as another forum for instructing prescribing physicians as to Wellbutrin SR's off-label uses.

### 1.     PRIDE Programs Aggressively Promoted Off-Label Use Of Wellbutrin SR

78.     Glaxo's PRIDE Program is the linchpin of its off-label campaign.  PRIDE was launched in or about late 1999 or early 2000, and it quickly showed a favorable impact on new prescriptions of Wellbutrin SR.  Indeed, during the period at issue, PRIDE dinner programs yielded an approximate 280 percent return on investment.

79.     Comparable "on-label" dinner speaker programs conducted by Glaxo have a return on investment of approximately 20 to 120 percent.

80.     From the program's inception, Glaxo has conducted many thousands of PRIDE events.  In 2002 alone, for example, Glaxo scheduled approximately 2,000 PRIDE events.  In addition, Glaxo supplemented its PRIDE campaign by conducting thousands of local speaker events to promote Wellbutrin SR.

81.     Glaxo's PRIDE program events featured speakers who had particularly strong off-label messages.  Because Glaxo representatives attended every PRIDE program event and obtained copies of the presentations, the company was well aware of the off-label content of the speaker programs.  Indeed, it was those PRIDE speakers with strong off-label claims who were invited to speak most frequently.

82.     Speakers were typically compensated $2,000 to $3,000 for the approximately one hour program.  Because many of the speakers traveled the country making virtually identical presentations at each location, no (or extremely little) additional preparation time was necessary.  Each payment and any other form of compensation to the speakers and presenters at these events constituted a reward or kickback for the recipients' advocacy and promotion of the off-label uses of Wellbutrin SR.

83.     Among the PRIDE speakers most frequently used by Glaxo are: Dr. James Pradko, Dr. James Hudziak, Dr. Norman Sussman; Dr. Anita Clayton, Dr. Jeffrey Green and Dr. Sarah Atkinson.  In hundreds of programs every year, these particular speakers made PRIDE presentations saturated with off-label representations.  Drs Pradko and Hudziak, in particular, promoted Wellbutrin SR's off-label use at hundreds of Glaxo PRIDE programs and local speaker events every year, and received as much as $500,000 or more annually in compensation from Glaxo for promoting Wellbutrin SR.

23

84.   Physicians were targeted for invitations to attend PRIDE events based on their prescribing strength. In advance of the dinner, physicians' prescribing practices were reviewed and high prescribers were invited, particularly if the trend of their Wellbutrin SR prescriptions was falling rather than rising. The PRIDE event was seen as a means of directly boosting or reinforcing their Wellbutrin SR prescriptions.

85.   Information about off-label uses of Wellbutrin SR was proactively provided to event attendees by the "national" PRIDE speakers. Dr. James Pradko was utilized by Glaxo more frequently than any other PRIDE speaker - although Dr. James Hudziak was a close second. Dr. Pradko was also hired by Glaxo to present at sales representatives training sessions - both initial and "advance" sales training - and was repeatedly a presenter at Glaxo's Wellbutrin SR National Speaker Training Meetings. Dr. Pradko, whose specialty is family practice, was also appointed to Glaxo's National Advisory Board.

86.   Dr. Pradko traveled to every Glaxo sales region to present his standard presentation - "The Neuroreceptor Basis of Initial Antidepressant Choice." In 2002, Pradko made this presentation at 156 PRIDE events, as well as approximately 165 local speaker events and "special issue boards." In 2002, Glaxo compensated Dr. Pradko approximately $600,000 for these various speaking engagements alone.

87.   Pradko's presentation was permeated with off-label representations and claims about Wellbutrin SR. Indeed, Dr. Pradko's off-label representations far outnumbered his observations about Wellbutrin SR treatment for its on-label indication. Among other claims, Dr. Pradko represented that Wellbutrin SR could be used for weight loss; attention deficit disorder in pediatric patients; chronic fatigue syndrome; marital dysfunction; erectile

24

dysfunction; addictions and chemical dependencies; attention disorders; sleep disorders and to restore REM levels of sleep; to restore libido and a healthy sex life; low energy in anxious patients; treatment of pregnant women; and, as an "add-on" to treat SSRI side effects such as "poop out", sexual dysfunction and weight gain.

88.     Many of Dr. Pradko's claims are directly contrary to Wellbutrin SR's prescribing information. For example, Dr. Pradko asserted that he put all of his pregnant patients on Wellbutrin SR and further claimed that the FDA said that it is safest in pregnancy. Wellbutrin SR's prescribing information, however, specifically cautions that it "should be used during pregnancy only if clearly needed" and that "there are no adequate or controlled studies in pregnant women."

89.     In addition, Dr. Pradko's claims concerning Wellbutrin SR use in treating sleep disorders are called into question by labeling information that cautions that, in placebo-controlled trials, between 11 and 16 percent of patients receiving Wellbutrin experienced insomnia. Similarly, Pradko's claims advocating use of Wellbutrin SR in pediatric patients are contrary to the drug's FDA approval only for patients over the age of 18. Glaxo's prescribing information further warns that the safety and effectiveness of Wellbutrin SR in pediatric patients is not established.

90.     Other PRIDE speaker presentations were similarly saturated with off-label treatment claims. In standard presentations that were delivered hundreds of times at Glaxo PRIDE and local speaking events, Dr. James Hudziak advocated using Wellbutrin SR for a wide range of off-label treatments including ADHD, addictions, obesity, weight reduction in the "chubby," and bi-polar disorders.

25

91.     Dr. Norman Sussman's standard PRIDE presentation incorporated

representations that Wellbutrin SR promotes weight loss, including in nondepressed patients.

Dr. Sussman also advocated using Wellbutrin SR to treat ADHD, smoking cessation, SSRI

side effects and chronic fatigue syndrome.  Sussman further claimed that Wellbutrin SR

increases REM level sleep, provides a more restful sleep, and that it is useful in treating

Parkinson's patients.

92.     Although Wellbutrin SR is specifically contraindicated for patients with

seizure disorders and/or eating disorders, Dr. Sussman made claims that either improperly

minimized or contradicted the drug's FDA-approved labeling.  In particular, Dr. Sussman

represented that Wellbutrin SR's seizure rates were either equivalent to or less than the rates

seen with SSRIs, even though no head-to-head trials have established comparative seizure

rates.

93.     Dr. Sussman also suggested that Wellbutrin SR could be used to treat patients

with eating disorders, even though the drug's labeling information provides a specific

contraindication for use by eating disorder patients because of seizure risk.  Sussman

minimized that risk, and advocated instead that patients suffering from eating disorders

merely supplement their Wellbutrin SR with topomax, an anti-seizure medication.

94.     Drs. Sarah Atkinson and Anita Clayton also presented conclusions that

Wellbutrin SR promoted weight loss in the nondepressed, among other things.  And, Dr.

Jeffrey Green presented Wellbutrin SR as a treatment for cocaine and alcohol addictions, as

well as for ADHD.  In doing so, Dr. Green, like Dr. Sussman and others, improperly

minimized Wellbutrin SR's FDA-required seizure risk labeling by suggesting that the drug's

26

seizure risk was less than certain SSRI's even though no head-to-head clinical trials have been conducted.

95. Glaxo representatives attended every PRIDE speaking event and were well aware of the off-label claims made by putatively "independent" consultants. Leading speakers such as Drs. Pradko, Hudziak, Sussman, Clayton and Atkinson spoke dozens of times a year and were highly sought after by Glaxo for promotional events. By actively and frequently employing the speakers, with full knowledge of the content of their presentations, Glaxo fully adopted their off-label claims.

96. Indeed, in the case of Dr. James Pradko, his off-label message was expressly adopted by Glaxo. Not only did Dr. Pradko appear and present at Glaxo sales training sessions, but on March 23, 2000, Pradko's standard presentation was copied and provided to every sales representatives responsible for promoting Wellbutrin SR. As alleged above, Dr. Pradko's presentation is permeated with off-label claims concerning Wellbutrin SR.

97. In addition, Glaxo actively promoted Dr. Pradko's off-label message. Hundreds, if not thousands, of audiocassette tapes of Dr. James Pradko's standard lecture were purchased by Glaxo through regional sales budgets, and were actively distributed by Glaxo sales representatives when calling on prescribing physicians. The cassette tapes are priced at approximately $20 each, and represented substantial additional compensation by Glaxo for promotion of Dr. Pradko's off-label message. Glaxo's payments to Dr. Pradko for these tapes constituted a reward or kickback by Glaxo to Dr. Pradko in exchange for Dr. Pradko's advocacy and promotion of the off-label uses of Wellbutrin SR.

98. Glaxo sales representatives distributed the Pradko tape liberally to reinforce

27

the strong off-label message and to promote the use of Wellbutrin SR for such non-approved indications as ADHD, combination therapy for SSRI side effects, weight control, sexual dysfunctions, cocaine or alcohol addictions. Glaxo sales representatives distributed hundreds, if not thousands, of Dr. Pradko's tapes on sales calls to prescribing doctors.

99.    For example, Glaxo sales representatives provided the Pradko tape to the following physicians, among many hundreds of others. In some cases, Glaxo sales representatives provided multiple copies of the tape to the same physician.

> Dr. Jeffrey Krotenberg of Lake Mary, Florida - November 15, 2000
>
> Dr. Owen Sheekey of Vineland, New Jersey - February 26, 2001
>
> Dr. Sarah Morris of Long Branch, New Jersey - March 13, 2001
>
> Dr. Karen Bowles of Philadelphia, Pennsylvania - April 18, 2001
>
> Dr. Young Kim of Brownstown Township, Michigan - May 7, 2001
>
> Dr. Ashok Jain of Murrysville, Pennsylvania - May 24, 2001
>
> Dr. Scott Lance of Ashland, Kentucky - June 1, 2001
>
> Dr. Patricia Lapkin of Ashland, Kentucky - June 1, 2001
>
> Dr. Uzma Ehtesham of Pikeville, Kentucky - June 21, 2001
>
> Dr. William Matthew of Pikeville, Kentucky - June 21, 2001
>
> Dr. Jay Narola of Pikeville, Kentucky - June 21, 2001
>
> Dr. Richard Minnihan of Wausau, Wisconsin - June 27, 2001
>
> Dr. Douglas Keagle of Darby, Pennsylvania - July 31, 2001
>
> Dr. Matthew Meyer of Madison, Wisconsin - August 13, 2001
>
> Dr. Amita Talati of Voorhees, New Jersey - August 23, 2001
>
> Dr. Malgorzata Piszcz-Connelly of Millville, New Jersey - September 10, 2001
>
> Dr. Elmer Harden of Riverdale, Georgia - October 9, 2001
>
> Dr. Donna Scott of Newnan, Georgia - October 17, 2001
>
> Dr. Geraldine Yarne of Tucson, Arizona - November 7, 2001

28

Dr. Mark Bernstein of Montgomeryville, Pennsylvania - November 13, 2001

Dr. Cira Amenta of Souderton, Pennsylvania - November 29, 2001

Dr. Jane Gallant of Fountainville, Pennsylvania - November 29, 2001

Dr. Carla Patton of Fountainville, Pennsylvania - November 29, 2001

Dr. Priscilla Benner of Pennsburg, Pennsylvania - November 30, 2001

Dr. Cory Krueger of Lansdale, Pennsylvania - November 30, 2001

Dr. Richard Lorraine of Harleysville, Pennsylvania - November 30, 2001

Dr. Cletus Carvalho of Hazard, Kentucky - December 5, 2001

Dr. John Schremly of Corbin, Kentucky - December 5, 2001

Dr. Jonathan Cowen of Lansdale, Pennsylvania - December 14, 2001

Dr. Terry Vondrak of Tucson, Arizona - December 14, 2001

Dr. Rafael Tortosa of New Providence, New Jersey - February 15, 2002

Dr. James Hutchins of Somerville, New Jersey - February 22, 2002

Dr. Stefan Lerner of Bridgewater, New Jersey - March 14, 2002

Dr. Vincent Colon of Watchung, New Jersey - March 15, 2002

Dr. John Titus of Phillipsburg, New Jersey - March 15, 2002

Dr. Dong Moon of Dayton, Ohio - April 30, 2002

Dr. Martha Tymeson of Dayton, Ohio - April 30, 2002

Dr. Roddy Ingraham of Rocky Face, Georgia - May 28, 2002

Dr. Sandra Wiederhold of Richland, Michigan - June 12, 2002

Dr. Susan Seidler of Westerly, Rhode Island - June 13, 2002

Dr. Leopoldo Covarrubias of Battle Creek, Michigan - June 21, 2002

Dr. Amy Doorley of Portsmouth, Rhode Island - July 16, 2002

Dr. Ralph La Guardia of Mansfield Center, Connecticut - July 23, 2002

Dr. Mary Krolik of New Orleans, Louisiana - August 28, 2002

Dr. Benjamin Monato of Sterling Heights, Michigan - August 29, 2002

Dr. Russell Brubaker of Muskegon, Michigan - September 3, 2002

Dr. Mazhar Munir of Grand Rapids, Michigan - September 3, 2002

Dr. Bisel Brikho of Lathrup Village, Michigan - September 4, 2002

29

Dr. Herbert Brennan of East Greenwich, Rhode Island - September 6, 2002

Dr. Michael Fusillo of Allegan, Michigan - September 9, 2002

Dr. Philip Haines of Grand Rapids, Michigan - September 10, 2002

Dr. Edward Roberts of Detroit, Michigan - September 10, 2002

Dr. Marwan Tabbara of Three Rivers, Michigan - September 10, 2002

Dr. Susan Yoder of Three Rivers, Michigan - September 10, 2002

Dr. Rebecca Santiago of Highland, Michigan - September 11, 2002

Dr. Sanker Jayachandran of Munster, Indiana - September 12, 2002

Dr. Joan Kuric of Munster, Indiana - September 12, 2002

Dr. David Henley of New Castle, Indiana - October 2, 2002

Dr. Randall Christenson of Grand Rapids, Michigan - October 4, 2002

Dr. Juvvala Reddy of Rochester Hills, Michigan - October 4, 2002

Dr. Vincent Colon of Watchung, New Jersey - October 14, 2002

Dr. Gerardo Moreira of El Paso, Texas - October 15, 2002

Dr. Kenneth Kron of Rochester Hills, Michigan - October 22, 2002

Dr. Puthenparampil Vijayakumaran of Wayne, Michigan - October 29, 2002

Dr. Jun Cho of Westland, Michigan - October 31, 2002

Dr. Melanie Kates of Fairport, New York - November 5, 2002

Dr. Pamela Marini of Clifton Springs, New York - November 5, 2002

Dr. Becca Mcnamara of Clifton Springs, New York - November 5, 2002

Dr. Joel Shamaskin of Rochester, New York - November 8, 2002

Dr. Rochelle Barrone of Webster, New York - November 8, 2002

Dr. Kelly Chura-singh of Crawfordsville, Indiana - December 4, 2002

Dr. Teri Schwarz of Morgan City, Louisiana - December 10, 2002

Dr. Stanley Russell of Brandon, Mississippi - December 11, 2002

Dr. Richard Gerhardstein of Port Washington, Wisconsin - January 6, 2003

Dr. Carol Robinson of Saint Louis, Missouri - January 16, 2003

Dr. Kimberly Davis of Monette, Arkansas - January 24, 2003

100.    In addition to proactively distributing the Pradko tape to prescribing

physicians, Glaxo sales representatives also actively discussed and reviewed the content of

PRIDE speaker presentations, as alleged in the following sections. The purpose was to

promote particular off-label uses identified in the presentations and/or to reinforce the PRIDE

speakers' off-label message. Accordingly, Glaxo actively adopted the presentations of their

so-called "independent" PRIDE program speakers in its own direct promotion and sales to

prescribing physicians.

> 2.    **Glaxo Promoted Off-Label Uses Of Wellbutrin SR Through
> "Special Issue Boards" Which Paid High-Prescribing Physicians
> To Listen To Improper Promotional Claims**

101.    During 2000 and 2001 at least, Glaxo also utilized "Special Advisory Boards"

or "Special Issue Boards" to disseminate its off-label message for Wellbutrin SR. Although

the Special Advisory Boards were purportedly comprised of local "thought leaders" for the

purpose of providing independent advice on Wellbutrin SR, in fact, the "advisory" boards

were little more than promotional events with a different name.

102.    Physicians invited to the "advisory" meetings were not asked for advice or

expert consultation. Instead, Glaxo invited high-prescribing physicians to have them listen to

off-label promotion of Wellbutrin SR and to influence their prescribing practices. Glaxo held

many hundreds of these Wellbutrin SR "special advisory" boards across the country. Indeed,

in the first six months of 2001, for example, Glaxo held twenty "advisory" board meetings in

and around just the Philadelphia area alone.

103.    Glaxo paid thousands of physician participants between $250 and $750 simply

to attend a single "advisory" meeting. The payments did not reflect the value of services

31

provided. The physician was not required to do anything but show up to receive his or her check. In addition, Glaxo had no legitimate business reason to hire thousands of "advisors" - who also were high prescribing physicians - to "consult" with the company about a single drug. Each of these payments constituted a reward or kickback for the purpose of influencing the recipients' prescribing practices.

104.    In addition, the "advisory" board speakers - Drs. Pradko, Hudziak, Green and others - typically received $2,000 to $3,000 to make their standard "pre-packaged" presentation on Wellbutrin SR. Each of these payments constituted a reward or kickback for the recipients' advocacy of off-label uses of Wellbutrin SR.

105.    In most cases physician participants were selected to attend the "advisory" board meeting based on the strength and history of their Wellbutrin SR prescriptions and their ranking in the regional market, rather than on their leadership or distinction in professional practice. Glaxo targeted physicians with "high decile" prescribing activity, particularly those who had written fewer Wellbutrin SR prescriptions in the most recent quarter. Glaxo invited such "high decile" physicians with a recent "negative" prescribing trend to participate in the Wellbutrin SR advisory board in order to influence and increase their recent prescribing activity.

106.    The "advisory" meetings were typically conducted over dinner at fine local restaurants or top-notch hotels. At the "advisory board" meeting, physicians would listen to extended presentations concerning Wellbutrin SR, and particularly about its off-label uses. Frequently, if not most of the time, the "advisory board" presentations were made by PRIDE speakers, including Drs. Pradko and Hudziak, who gave the same standard presentations as

32

they did at PRIDE speaking events. The majority of the material presented to the "advisory boards" concerned the off-label uses for Wellbutrin SR, rather than its on-label indication.

107. The following are among the "advisory" board meetings Glaxo conducted in just the Philadelphia area. In 2000 and 2001, hundreds of other, similar "advisory" board meetings were conducted by Glaxo at luxury locations around the country.

| Date | Location | Presenter | Payment To Attend |
|------|----------|-----------|-------------------|
| December 12, 2000 | Ritz Carlton, Philadelphia | Dr. Jeffrey Green | $300 |
| January 5, 2001 | Ritz Carlton, Philadelphia | Dr. Troy Thompson | $500-$250 |
| January 6, 2001 | Ritz Carlton, Philadelphia | Dr. Troy Thompson | $250 |
| January 11, 2001 | Four Seasons, Philadelphia | Dr. James Pradko | $250 |
| January 30, 2001 | Four Seasons, Philadelphia | Dr. James Pradko | $250-$350 |
| January 31, 2001 | Manhattan Steak House | Dr.Matthew Pitera | $250 |
| February 23, 2001 | Savona, Philadelphia | Dr. Timothy Smith | $500 |
| March 1, 2001 | Green Hills Inn | Dr. James Pradko | $250 |
| March 14, 2001 | Catalano Restaurant, Enola | — | $250 |
| March 18, 2001 | Four Seasons, Philadelphia | Dr. James Pradko | $250-$350 |

33

| | | | |
|---|---|---|---|
| March 28, 2001 | Knife & Fork Restaurant Atlantic City | Dr. Matthew Pitera | $250 |
| April 4, 2001 | Jean Pierre, Philadelphia | Dr. James Hudziak | $500 |
| April 20, 2001 | Four Seasons, Philadelphia | Dr. James Hudziak | $250-$350 |
| April 21, 2001 | Four Seasons, Philadelphia | Dr. James Hudziak | $500 |
| May 5, 2001 | Ritz Carlton, Philadelphia | Dr. James Pradko | $250 |
| May 12, 2001 | Ritz Carlton, Philadelphia | Dr. James Pradko | $250 |
| May 12, 2001 | Conshohocken Marriott | Dr. James Pradko | $250 |
| May 18, 2001 | Four Seasons, Philadelphia | Dr. James Hudziak | $250-$350 |
| May 19, 2001 | Westin Philadelphia | Dr. James Hudziak | $500 |
| May 20, 2001 | Westin Philadelphia | Dr. James Hudziak | $500 |
| May 25, 2001 | Glasbern Inn | Dr. Norman Sussman | $250 |
| June 2, 2001 | Ritz Carlton, Philadelphia | Dr. Jeffrey Green | $750 |
| June 14, 2001 | Accomac Inn | Dr. B. Kenneth Nelson | na |
| June 16, 2001 | Hershey Hotel | Dr. James Pradko | $250 |
| June 19, 2001 | Susanna Foo, Philadelphia | Dr. Jeffrey Green | $350 |
| June 21, 2001 | High Point | Dr. James Pradko | $250 |
| July 14, 2001 | Philadelphia Marriott | Dr. James Hudziak | $750 |
| August 25, 2001 | Ritz Carlton, Philadelphia | Dr. James Hudziak | $250 |
| September 24, 2001 | Savona, Philadelphia | Dr. James Hudziak | $350 |
| September 28, 2001 | Ryland Inn | Dr. James Pradko | $250 |
| November 10, 2001 | Princeton Hyatt | Dr. James Hudziak | $500 |

C.     **Glaxo Immersed Its Sales Force In Information Concerning Off-Label Uses
        And Tested Their Proficiency In Off-Label Information**

108.    Glaxo's Wellbutrin SR sales force was also actively encouraged to promote the

drug for off-label treatments.  From the time of their introductory sales training and throughout

their tenure with the company, Glaxo bombarded its sales force with information concerning off-

label treatments with Wellbutrin SR.

109.    Among other things, Dr. James Pradko provided his standard presentation - The

Neuroreceptor Basis of Initial Antidepressant Choice - at new representatives sales training.  As

alleged above, Dr. Pradko's presentation incorporates numerous off-label claims about

Wellbutrin SR.  Before Glaxo sales trainees had been fully instructed about Wellbutrin SR's on-

label indications, prospective sales representatives were instructed about the drugs off-label

opportunities.

110.    In addition to requiring new-hires' attendance at Dr. Pradko's presentation, in

March 2000 every Glaxo sales representative handling Wellbutrin SR also received a personal

copy of Pradko's standard presentation, replete with off-label claims.

111.    Further, Glaxo stressed to its sales force that Wellbutrin SR promoted weight loss

in non-depressed patients, and also treated sexual dysfunction in non-depressed patients.  For

example, in October 2000 all members of Wellbutrin SR Field Sales Teams received copies of an

article posted on Salon.com concerning Wellbutrin SR's sex-enhancing effects.  The article

discussed the use of Wellbutrin SR (a) as an "add on" to treat SSRI-induced sexual problems; (b)

for erectile dysfunction in nondepressed men; (c) for sexual dysfunction in the nondepressed; and

(d) for sexual dissatisfaction in nondepressed women.

112.    Glaxo sales representatives were barraged with information concerning the use of

Wellbutrin SR to promote weight loss in the <u>nondepressed</u>.  Sales representatives were provided with multiple copies of the results of numerous Glaxo-funded studies on weight loss in the nondepressed.  For example, on June 27, 2001, Glaxo distributed a memorandum to all its Wellbutrin SR sales force concerning new clinical data on the drug's impact on weight loss in non-depressed obese patients.  Other materials on weight loss in the nondepressed distributed by Glaxo include:  "Bupropion for Weight Loss: An Investigation of Efficacy and Tolerability in Overweight and Obese Women," K. Gadde, et al; "Buproprion SR Significantly Enhances Weight Loss When Used With A Moderate-Intensity Lifestyle Intervention," J. Anderson et al.; "Effects of Bupropion SR on Body Weight," K. Fujioka

113.   Indeed, Glaxo interrupted an "all hands" sales force meeting on migraine treatment, "Migraine University," in mid-2001 so that a live presentation could be made by Dr. Ken Fujioka on his just-released results of Wellbutrin SR's impact on body weight in the nondepressed.

114.   In addition, in late 2001 and early 2002, all Glaxo sales representatives handling Wellbutrin SR were required to take a <u>mandatory</u> written "knowledge certification" on the off-label weight data concerning nondepressed patients.  Sales representatives were also tested on their verbal mastery of the off-label material.  Similar tests were conducted for the use of Wellbutrin SR to treat ADHD.

115.   Glaxo's emphasis on various off-label uses translated into direct promotion to prescribing physicians by the company's sales representatives.  Although Wellbutrin SR is not FDA-approved for patients under the age of 18, for example, Glaxo required that sales representatives visit pediatricians and child psychiatrists to market Wellbutrin SR.  Every

36

quarter, sales representatives were given "optimal frequency" lists that identified the number of

visits each representative was required to make on a particular doctor in that three month period.

The number of visits ranged from one to ten per doctor, and depended on the particular

physician's prescribing activities.

116.    Child psychiatrists and pediatricians were among those specialties targeted by

Glaxo for marketing Wellbutrin SR. Sales representatives were required to visit certain

pediatricians and child psychiatrists as many as ten times in a three month period. Indeed, on

their sales calls Glaxo representatives actively promoted Wellbutrin SR for such off label

indications as ADD/ADHD, and pediatric depression - neither of which were approved

indications for the drug.

117.    The following examples are representative of Glaxo's Wellbutrin SR off-label

promotional efforts directed at pediatricians and child psychiatrists.

    b.    On November 27, 2001, Dr. David Hernandez of Santa Barbara, California
           was "updated" on the use of Wellbutrin for ADHD.

    b.    On January 1, 2000, a Glaxo sales representative advised Dr. Paul Fleiss
           of Los Angeles, California on prescribing information for the use of
           Wellbutrin SR for his ADHD patients.

    c.    On January 12, 2000, a Glaxo sales representative reviewed the use of
           Wellbutrin SR to treat ADHD with Dr. Negar Ghafouri of Manhattan
           Beach, California.

    d.    On December 3, 2001, a Glaxo sales representative advised Dr. Denice
           Cook of Tinley Park, Illinois on the use of Wellbutrin for treating

37

depression, ADD and ADHD in children.

e.   On July 3, 2003, a Glaxo sales representative "talked up" the success and popularity of off-label use of Wellbutrin SR to treat ADHD to Dr. Thu Thao Trinh of Minocqua, Wisconsin.

f.   On April 16, 2001, on a sales visit with Dr. William Bruno of Hollywood, Florida, a Glaxo representative "let him know about" Wellbutrin SR and ADHD.

g.   On March 19, 2001, a Glaxo sales representative discussed the use of Wellbutrin SR for children with ADHD with Dr. Bruce McIntosh of Jacksonville, Florida, and advised him on suggested dosing.

h.   On June 22, 1999, a Glaxo sales representative advised Dr. Shelley Griffin of Waynesboro, Georgia about Wellbutrin SR's "success" in treating ADHD.

i.   On August 3, 1999, a Glaxo sales representative reviewed the use of Wellbutrin SR for treating ADHD and the "reasons why it is so successful" with Dr. Shelley Griffin of Waynesboro, Georgia.

j.   On February 22, 2001, a Glaxo sales representative called on Dr. Gary Hayes of Jasper, Tennessee and told him about the use of Wellbutrin SR in ADHD patients, and showed him Dr. James Hudziak's study (funded by Glaxo) concerning treatment of ADHD with Wellbutrin SR. On a June 28, 2001 visit with Dr. Hayes, a Glaxo representative reviewed the use of Wellbutrin for ADHD and also for weight loss.

k.  On August 14, 2000, a Glaxo sales representative told Dr. Josh Smith of Chattanooga, Tennessee about the use of Wellbutrin SR for ADHD.

l.  On September 27, 2001, a Glaxo sales representative discussed the use of Wellbutrin SR in treating pediatric ADD with Dr. David Suholet of Atlanta, and advised him about dosing for a twelve year old patient.

m.  On December 5, 2000, a Glaxo sales representative told Dr. Herbert Copeland of Greenfield, Massachusetts about using Wellbutrin SR for children with ADD and ADHD.  Although Dr. Copeland prescribes Ritalin, he indicated that he was "willing to give Wellbutrin SR a try more often."

n.  On May 14, 2002, a Glaxo representative called on Dr. Juan Bonetti of Abbeville, South Carolina and noted that "[e]ven though he is a pediatrician, I talked with him about my products, because all have data in children.  (adhd- wbsr; imitrex nasal spray-adolescent migraine).  Had a good talk about kids."

o.  On a February 4, 2000 sales call to Dr. Jamison Roberts of Newnan, Georgia, a Glaxo representative reviewed the use of Wellbutrin SR for treating ADHD.

p.  On October 19, 2001, a Glaxo sales representative "went over" the use of Wellbutrin SR for ADD and ADHD with Dr. Robert Benak of Dothan, Alabama.

q.  On a May 26, 1999 sales visit to Dr. Rosemary Faust of Birmingham,

Alabama, a Glaxo sales representative advised her that lots of psychiatrists use Wellbutrin SR for ADHD.

r.   On June 10, 1999, a Glaxo representative advised Dr. Linda Spencer of Indianapolis, Indiana about the use of Wellbutrin SR for ADHD in pediatric patients.

118.   Glaxo sales representatives also proactively promoted the results of recent studies of nondepressed patients treated with Wellbutrin SR for weight loss and sexual dysfunction. Similarly, Glaxo directly promoted Wellbutrin SR as an "add on" combination therapy to address SSRI-induced side effects, such as weight gain, sexual dysfunction, and so-called "poop out" or loss of energy. The use of Wellbutrin as an "add on" was distinct from its use as an antidepressant for the combined therapy was to address indications other than depression, such as weight gain, loss of libido and loss of energy. None of these off-label treatments were FDA-approved indications.

119.   The following examples are representative of Glaxo's off-label sales efforts with prescribing physicians promoting the use of Wellbutrin SR as an off-label treatment for sexual dysfunction, energy loss, weight loss, or as an "add on" for SSRI side effects.

a.   On January 6, 2003, a Glaxo sales representative visited with Dr. Richard Gerhardstein of Port Washington, Wisconsin and "reminded" him that Wellbutrin SR can be added to SSRI treatment "to get rid of sexual dysfunction." He also advised Dr. Gerhardstein on dosing.

b.   On a September 12, 2002 call on Dr. Marjaneh Rouhani of Battle Creek,

40

Michigan, a Glaxo sales representative "previewed" the major points on the Pradko tape, and also provided weight loss data involving nondepressed patients treated with Wellbutrin SR.

c. On a July 24, 2001 call to Dr. Donna Scott of Newnan, Georgia, a Glaxo sales representative reviewed Dr. Pradko's conclusions and suggested adding Wellbutrin SR for patients taking SSRIs.

d. On February 15, 2001, a Glaxo sales representative informed Dr. Craig Tutton of Ardmore, Oklahoma about Wellbutrin SR's treatment of SSRI "poop out," weight gain and sexual dysfunction, as well as ADHD. He reported that Dr. Tutton "definitely was attentive and interested. Cha-Ching!!!"

e. On a February 21, 2003 visit to Dr. Robert Bulten of Grand Rapids, Michigan, a Glaxo sales representative discussed the use of Wellbutrin SR for addictions and ADD, and "encouraged" him to treat ADD patients with Wellbutrin "to counter the addictions."

f. On June 13, 2002, a Glaxo sales representative called on Dr. Susan Seidler of Westerly, Rhode Island and reported that he gave her a tape of Dr. Pradko's presentation and now she is "augmenting" with Wellbutrin SR.

g. On January 23, 2001, a Glaxo sales representative "reminded" Dr. Stephen Besson of Cynthiana, Kentucky to write Wellbutrin SR to treat sexual dysfunction and weight gain.

h. On July 31, 2001, a Glaxo sales representative provided Dr. Douglas

41

Keagle of Darby, Pennsylvania with Dr. Pradko's tape and slides and discussed recent weight loss trials involving nondepressed patients.

i. On July 12, 2001, a Glaxo sales representative called on Dr. Edward Opass of Doylestown, Pennsylvania and reported that after listening to Dr. Pradko he is using Wellbutrin SR as an "adjunct" treatment with some of his patients receiving SSRIs.

j. On November 13, 2002, a Glaxo sales representative proactively provided Dr. Pushpa Mukerjee of Canton, Michigan with recent weight loss data concerning use of Wellbutrin SR in nondepressed patients.

k. On July 10, 2002, a Glaxo sales representative previewed a study involving use of Wellbutrin SR to treat sexual dysfunction with Dr. Lalitha Gurijala of Wallingford, Pennsylvania.

l. On a December 17, 2002 a Glaxo sales representative promoted the Pradko tape to Dr. Leopoldo Covarrubia of Battle Creek, Michigan, and proactively reported on a recent Glaxo-funded study concerning use of Wellbutrin SR for the treatment of sexual dysfunction.

m. On June 28, 2001, a Glaxo sales representative told Dr. Gary Hayes of Jasper, Tennessee about the use of Wellbutrin SR for ADHD and weight loss.

n. On August 19, 2001, a Glaxo sales representative told Dr. Yolanda Spraggins of Chattanooga, Tennessee about the use of Wellbutrin for ADHD and "weight issues" in kids.

42

o. On November 13, 2000, a Glaxo sales representative told Dr. Kristina Wagner of Dillsburg, Pennsylvania about recent studies that involved use of Wellbutrin SR for weight loss and increased sexual satisfaction in nondepressed patients.

p. On March 25, 2001, a Glaxo sales representative told Dr. Ralph Green of Knoxville, Tennessee about the "weight benefits" of Wellbutrin SR and a recent Glaxo-funded study concerning weight loss in nondepressed patients.

q. On March 12, 2002, a Glaxo sales representative "reminded" Dr. Robert Jones of Ranson, West Virginia about the use of Wellbutrin SR for weight loss.

r. On February 28, 2001, a Glaxo sales representative advised Dr. Michael Visick of Logan, Utah about the use of Wellbutrin SR for erection disorder and sexual desire disorder.

## Count I

### False Claims Act 31 U.S.C. §§3729(a)(1) and (a)(2)

120. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 119 of this Complaint.

121. This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. §3729, et seq., as amended.

122. By virtue of the acts described above, defendants knowingly made or caused to be made or presented, false or fraudulent claims, records and statements to the United States

43

Government.

123.    Each prescription that was written as a result of defendants' illegal marketing practices represents a false or fraudulent record or statement.  And, each claim for reimbursement for such off-label prescriptions submitted to a federal health insurance program represents a false or fraudulent claim for payment.

124.    By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Government to approve and pay such false and fraudulent claims.

125.    Plaintiff cannot at this time identify all of the false claims for payment that were caused by Glaxo's conduct.  The false claims were presented by thousands of separate entities, across the United States, and over many years.  Plaintiff has no control over or dealings with such entities and have no access to the records in their possession.

126.    The Government, unaware of the falsity of the records, statements and claims made or caused to be made by the defendants, paid and continues to pay the claims that would not be paid but for Glaxo's illegal off-label marketing practices.

127.    By reason of the defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount.  Federal health insurance programs have paid many thousands of claims, amounting to many hundreds of millions of dollars, for Wellbutrin SR treatments that are not approved by the FDA and that have not been established to be safe or effective.

## Prayer

WHEREFORE, plaintiff prays for judgment against the defendants as follows:

1.  that defendants cease and desist from violating 31 U.S.C. §3729 et seq.

2.  that this Court enter judgment against defendants in an amount equal to

three times the amount of damages the United States has sustained because of defendants'

actions, plus a civil penalty of not less than $5,000 and not more than $11,000 for each violation

of 31 U.S.C. §3729;

3.  that plaintiff be awarded the maximum amount allowed pursuant to

§3730(d) of the False Claims Act;

4.  that plaintiff be awarded all costs of this action, including attorneys' fees

and expenses; and

5.  that the United States and plaintiff recover such other relief as the Court

deems just and proper.

## Demand for Jury Trial

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff hereby demands a

trial by jury.

Dated: April 7, 2003

PHILLIPS & COHEN LLP

By: _____

Erika A. Kelton
Phillips & Cohen LLP
2000 Massachusetts Ave, N.W.
Washington, D.C. 20036
(202) 833-4567

BARTLETT HACKETT FEINBERG P.C.

By: _____

Howard M. Brown
BBO # 547948
Bartlett Hackett Feinberg P.C.
10 High St., Suite 920
Boston, MA 02110
(617) 422-0200

Attorneys for Plaintiff

46